Good morning. Thank you, Your Honors. May it please the Court, Paul Hughes for the National Association of Manufacturers and the National Gas Services Group. In today's marketplace, proxy firms wield considerable influence. Many fund managers vote in lockstep with proxy firms, and proxy firms auto-vote many shares. Proxy firms have been called force multipliers on ESG issues. Twenty-six Attorneys General filed an amicus brief in a parallel case in the Sixth Circuit, and they described some of the recent practices of proxy firms. It includes, for example, last year . . . Well, really, that's not material to the . . . I mean, it's certainly background, but it's pretty thoroughly explained in all the briefs, if you don't mind. So we've got a real interesting set of legal questions here. Thank you, Your Honor. I think the SEC's rescission rule is unlawful for three principal reasons. The first is the Fox-Texas v. Biden issue, that there is a direct contradiction of earlier factual findings without doing what is required of an agency to contradict its prior findings. The second is the justifications it gave are arbitrary and capricious on their face. And the third and final point is the procedure used here was plainly unlawful. I'll start with the FCC v. Fox point, unless the Court prefers a different order. Starting with FCC v. Fox and Texas v. Biden, the law is well established that when an agency wishes to reverse itself based on changing its prior factual findings, it can certainly do so, but the more detailed justification of Fox is required. This is what the Court said in Texas v. Biden, that detailed justification isn't just a good idea, but is absolutely required that the agency explain why its prior view was mistaken, misguided, or the like. Here, there's a clear reversal in factual finding. In 2020, underlying the 2020 rule, the SEC said clearly that the rule it adopted, including the issuer engagement provisions, would not cause material risk to proxy firms' timeliness or independence. That is, throughout the record, I point the Court to multiple statements in record page 207, a sentence spanning the record page 233 to 34, again on 34. I'm happy to go through all of those, but I know they're in the briefs and the Court is aware of those very clear statements by the SEC in 2020. They looked at the comments they received about the 2019 proposal. They identified ways that those comments showed there potentially were risks to timeliness or independence. Based on the provisions of the 2019 proposal, the SEC changed that proposal and said, in our view, there is no longer going to be a material risk to timeliness or independence. Now, timeliness in this context simply means getting the advice memo out to the clients, right, during the Season 1 shareholder proposals and so on. Absolutely, Your Honor. That's all it means. Correct. Well, let me ask you a factual question, which I will also ask the SEC. My understanding is that under the 2020 rule, what the PVABs are required to do is notify the registrant at or before it sends out to the clients. But at means, functionally, they just press a send button on the computer, right? Yes, Your Honor. Because they know who the registrant is. They know who the clients are. They've already written their advice, so they just press send. Is that all it is? That's all it is, Your Honor. And how does the SEC try to explain that in 22, that suddenly timeliness is an issue? We don't think there's a rational explanation. Not only did they not explain the departure, that's the Texas v. Biden problem, they can't explain it because, as the Court just explained, there's no rational reason to say that when you hit send and the registrant is on the recipient of the communication, that that affects timeliness. So what the SEC is left to do is to recycle the timeliness concerns that were raised about the earlier proposal, which was materially different than what Your Honor just described. Other than that, the argument that the SEC counsel attempts to advance in their brief, which we don't think fairly appears in the 2022 rescission rule, is something about the nature of the aggregate burden of these various things that are required. We don't think the Court should even look at that because, at most, they're plucking a clause from a comment letter. They're not actually looking to the SEC's affirmative analysis about any notion of aggregate burden. We also don't think it makes any sense. There's no connection between this idea of aggregate burden. I mean, aggregate burden is, are you talking about cost or timeliness? Well, Your Honor, the SEC tries to say that this notion of aggregate burden and cost affects timeliness. When you look at their brief at around pages 25, 26, they try to make the link, but we don't understand what that link is. As Your Honor just described, the timeliness happens when the advice is sent to the customers, and we can't see any reason why adding the registrant to the recipient list has any effect on the timeliness. But on this notion of burden, because the SEC wants to point to that often, you know, as we describe in the reply brief, the 2020 rule went through granular detail calculating, estimating what that burden could be in raw terms of hours and whatnot. And nothing in the 2022 rule actually looks to that very clear, quantified estimate of what that burden is. And if the 2022 rule was legitimately justified based on some causal effect of aggregate burden, you would think at bare minimum the SEC would look at that quantification of hours. This is in the analysis in the 2020 rule at record pages 242 to 244. And they would have tried to make some causal connection. Well, didn't they agree that that was likely? I mean, didn't they agree that the 2020 numbers were likely to occur? Yes, but in 2020 they haven't said those numbers were high. But what they've never done is said, this burden that we very clearly, explicitly quantified is going to have X, Y, or Z effect. They just waved their hand and say, oh, there could be a cost, there could be a burden. But in 2020, they told us using the proxy firm's own pretty inflated numbers, what that max burden, I'm sorry. You know, one half hour per employee per year in that business. And then in 2022, they accept that. But they never say, you know, let's talk about their— Enough to overturn 10 years of rulemaking. I think that's right, Your Honor. And they make the argument that, oh, because they have to do the issuer engagement on the mechanism, that that could— But is that a policy conclusion or a fact? Where do you draw that line? Well, on the Texas v. Biden issue, the view as to whether or not there is a risk to independence or timeliness, whether or not this will risk a material risk, that is absolutely a factual determination. It is based on the agency's determination as to what facts will occur in the future. And this is just on all fours with Texas v. Biden. There, when the court was looking at the migrant protection protocols, it discussed what the perverse incentives and the effect that the policy DHS had identified, the future effects it would have on those perverse incentives, and the remedy that the policy would have in addressing those perverse incentives. Then in 2021, when DHS changed its view, it reached a different prediction about the effect the policy would say would have less of an effect on mitigating what was described as the perverse incentives. These are predictive factual judgments about what will occur if certain steps are taken. This court in Texas v. Biden quite correctly said that that is at the heartland of what FOX, what FCC v. FOX is discussing in saying, when you're making a factual judgment, if a new policy is going to flip the agency's factual judgment, not to say the agency can't do so, but it has to recognize that it's making that change, and it actually has to provide substantive reasons as to why what it originally did was mistaken, misguided, or the like. That's what we expect of agencies for reasoned agency decision making. Talking about the independence rationale, it's also notable that most of this is recycled back from the 2019 rule when the mechanism was really quite something different, and there was that feedback before the proxy firms provided their advice to the customers. We don't see any meaningful way to say that with the 2020 rule, there's any material effect on the independence of proxy firms. The counsel makes a new argument that there could be litigation over the adequacy of the mechanism that is provided. Well, first, that argument doesn't appear anywhere in the 2022 rescission, and moreover, it's just belied by the fact that safe harbors were put in place in the 2020 rule. Again, FCC rests heavily on this notion of some sort of expanding burden, but I think if 2022 rescission really meant to be tethered to the burden, the FCC would have shown, would have actually done the homework of showing why the quantified calculated burden was really so onerous to have any effect on costs or on timeliness or independence, and that's just not done. I think what they do say in the 2022 rule is that there would be a risk to independence by sort of stultifying the decision making in advance because if PVAB knows that the registrant gets the advice immediately and then has right to, then they have to press another button and advise clients that the registrant had responded, that they might, because of that burden, they might be less independent to begin with. So the only thing they can point to that actually ties this idea of them having to do something after, the mechanism, isn't in the 2022 rescission, it's in the 2020 rule in a footnote, footnote 268 at record 199. It's not adopted there and it's never talked about in the 2022 rescission, but counsel has to point back to that. What they point to in the 2022 rule, and they cite it six times in their brief, is footnote 118. Again, note that we're talking about footnotes here. But no, 118 in the 2020 or the 2022? The 2022, Your Honor. And they cite that six times in their brief. And what that was, was a letter that was put out in 2020 by an organization, again, not 2022, it's the 2022 rule, Your Honor, but it's citing to a letter that's two years old at that point. So a 2020 letter. And what that letter just says is if proxy firms are criticized, that could generally potentially have some effect on independence. But that's not actually tethered to this. That's the whole point of the rule, isn't it? The whole point of the rule is to inspire dialogue. Yes, Your Honor. And proxy firms, the reality is they're criticized regardless of the rule. For example, I point the court to record pages 699 to 704, where my client, Natural Gas Services Group, specifically criticizes one of the proxy firms for just making a complete objective error in advice about where they recommended voting for one of the board of directors of this company. It's all spelled out in the record there. They're criticized regardless of this rule. So they want to point to footnote 118. But when the court looks at that, there's nothing about this rule that materially changes that degree of criticism. And again, Your Honor, I think it's to the argument that the SEC isn't making, which is the whole point that we're doing this, that the SEC did this in 2020, is because there were problems with the conflicts of interest and the quality of advice that proxy firms were being provided. And that's why the SEC in 2020 thought that these modest reforms were important to be able to make shareholders timely become aware of responses that registrants would be able to provide to the proxy firm's information. Just very briefly on the process-related issue, if the court were to affirm the 30-day or 31-day, because 30 days happened on a Sunday, period here, I think the effect of that would essentially be creating a safe harbor, saying that any time an agency gives a minimum of 30 days, that that, by default, is a meaningful opportunity within the scope of the APA. I don't think the court should say that. We're not saying 30 days is categorically improper. But when the courts dip below 60 days, which is generally recognized as the standard, I think it's appropriate for a court to take a reasonably hard look at that to understand in the facts and circumstances. So it's not a — it is an adjudicable question, is what you're saying. It is not controlled by the language of the APA? It's — ultimately, Your Honor, I think it's a reasonableness understanding. The courts call it — is it a meaningful opportunity? I think that's essentially a reasonableness test. I think if agencies give 60 days, that's pretty accepted, that that is pretty close to a safe harbor. Is there a test authority for that? For the 60 days? No. I understand there are a bunch of advisories about 60 days, including Mr. Gensler's own — Yes, Your Honor. — statements to Congress. But what I'm saying is a case law. Your Honor, candidly, other than other district courts that I know this Court can look to as potentially persuasive, but there's — the circuit courts have not had to wrestle with shortened 30-day rule periods in major rules like this because, frankly, they haven't been done. This is pretty unprecedented for an agency to do a rule of this significance and only give the public 30 days. But if you're not — if you're not — I'm not announcing — if you're not requesting a categorical rule on 30 days, what is the rule you would suggest we adopt? I think, Your Honor, if an agency — From other 30-day cases. If an agency dips below 60 days, I think it's incumbent on a court to take a meaningful look at that. And the questions that I think need to be asked, and this I think is as easy as a case comes, is did an agency give an explication as to why it was dipping below 60 days? Did it provide any justification? Here, it did not. Second, what's the broader — Some sort of recitation of the urgency. That would be certainly meaningful, Your Honor. Was it still in litigation at that point as to whether the refusal to enforce the rule was legal or not? Well, we had filed the litigation on that, Your Honor, yes, and that was in play before the district court at the time. So there might have been a reason for the agency to rush to try to undermine the district court. Well, if they — Your Honor, if they'd want to say that and put some answer, I'm not sure that would be a valid one, but yes. But additionally, so did the agency give an explanation? What's the broader context in terms of here, the rule that they were rescinding had 60 days? I think that's a pretty good benchmark. Again, this rule was published the day after Thanksgiving, and the comments were due the day after Christmas. I think context matters. I don't think there's any reasonable way to look at this when many regulated parties asked for an extension that was denied, and then importantly, I think it's worth noting, regulated parties, including the U.S. Chamber of Commerce, as they describe in their amicus brief, said we need more time to give you quantifiable data. The SEC denied that, did not extend the comment period, but then in the 2022 rescission, criticized the commenters for not providing them the quantitative data that they said they asked for. Well, we know why they didn't get it was because the chamber told them we need more time to be able to assemble this data, which the SEC didn't do. So I think all the indication is this was purposely rushed not to give the regulated public a meaningful opportunity. So I know I'm past my time. If there's ever a case where the comment period was truncated too shortly not to be a meaningful opportunity, it would be this, and if the court affirms, that essentially tells the agency 30 days is categorically a safe harbor, and I don't think that's right. Good morning, your honors. May it please the court, Daniel Matro for the Securities and Exchange Commission. Reasonable people can and do disagree about the notice and awareness conditions at issue in this case. That division stems from different reasonable judgments about how to weigh the conditions uncertain and unquantifiable benefits and risks. In rescinding the conditions in 2022, the commission met its obligation under Fox to acknowledge and give good reasons for weighing the competing interests differently than it did in 2020. It discussed a number of the considerations that it found persuasive, including the fact that the vast majority of investors and PVAP clients that depend on timely and independent proxy advice strongly opposed the conditions, believing that they continued to pose risks to the cost, timeliness, and independence of it. How could they know, since the rule never went into effect? They knew what the burdens were and could explain why they posed risks to timeliness and independence. Well, I mean, I'm a little unclear on the timing here, because when the 2020 rule had become effective in early 21, right, January of 21? Yeah, December 2020. Okay. And in March of 21, somebody at the SEC says, we're not going to enforce this. Correct? In June of 20, June of 2021. Yeah, but it was, before then they had already announced they were going to undo it or something. They already announced it was, all I'm saying is it becomes effective in December 2020. So whatever costs the PVABs had to bear for compliance should have been sunk in by December of 2020, right? So it was December 2021, and so some of the costs would have been incurred by December 2021, I think, which is when the notice and awareness conditions were going to go into effect, the compliance date. It was December 2021. So certainly by that time, some of those costs, but they were also on. So, all right. So they, in other words, even though they were, unless of course there was dealing behind the scenes, it would stand to reason that because the rule is going into effect in December and you say it's 2021, that's fine. I don't, anyway, they have already invested the costs. So it's not clear to me how the agency can argue that there are costs here. Because again, functionally, all the rule says is you push a button and send the PBA advice to the registrant at the very same time that you're sending to the registrant clients. I mean, your PVAB clients, right? That's not the only burden. That's the notice condition, but we're talking about the notice and awareness conditions and the commission. Well, the awareness condition means that if something has happened in response to the There isn't record evidence about exactly how PVABs would comply with that, but what it would require is that they monitor and potentially send multiple notices to clients when any of the thousands of recommendations that they make provokes, prompts the registrant's response. They have to monitor that. Well, but all I'm saying is by the effective date of the rule, the companies presumably wanting to follow the law had already adjusted their computer systems and procedures. Hadn't they? There isn't record evidence about what the PVABs may have done by now, but there were certainly... Well, the assumption of the 2022 is that we're on a blank slate and that the 2020 never went into effect, and oh my goodness, these people are going to have to invest a bunch of money. But if they had already invested, I mean, time, I don't know, procedures, man hours, I don't know. But if they had already complied with the law, that wasn't going to... That makes no sense. You had a significant number of... You had PVABs and a significant number of investors saying, if we have to comply with on an ongoing basis, they are going to pose a risk to timeliness and independence in the cost of advice. But the complaint about timeliness is irrational, right? Because all they have to do is push a button when they send out their advice to the registrants. But the commission specifically considered... Is that true or not true? I think that it's not true because there are more than... That's not the only burden. The commission... I know that's not the only burden, but that burden of timeliness doesn't exist. No, but there are combined burdens of having to do that, but more importantly, having to monitor. There are thousands of recommendations within a few months each year to see if the registrant responds. They don't have to monitor. I mean, you know, that's part... Okay. So those are all burdens. Oh, no. I mean, no, because obviously, if the registrant responds, I assume the registrant is going to notify the PVAB immediately because then the PVAB has to press another button and send a gross email that says, registrant filed response. Again, we don't know exactly how they're going to comply, but in 2020 itself, in the 2020 rule itself, the commission recognized that whenever you add burdens on PVABs in the middle of proxy season there, you create a risk of disrupting their advice, and it didn't say that risk is nonexistent here. It specifically said on 55137... Well, why does that risk? But there's no explanation for why that risk, which they thought was significantly alleviated in 2020... I won't use the word de minimis because that's not in the 2020 rule, but they felt that was significantly alleviated because, as we all know, in this mechanized world, it's a matter of pushing buttons on a computer once you have your systems perfected. And then in 2022, suddenly that becomes the main reason to undo the 10 years of negotiation. A couple of things. All the commission said in 2020 was that there would be a lesser risk of disruption that they... Well, I understand that, but I mean, here's the 2020 rule, and it goes on with its explanation for hundreds of 80-some pages, and the 2022 rule is only about 20 pages. So, you know, to suddenly pull one isolated thing out, one little thread out, which is the alleged cost of timeliness, and then say that undoes the entire 200 pages of explanation... I don't think... It doesn't make sense. Respectfully, I don't think that's what the commission did. In 2020, the commission recognized that there were distinct risks to timeliness and independence that... But in 2020, you don't explain a single... In 2022, as opposed to your briefing, all the commission parrots timeliness, independence, timeliness, independence, timeliness, independence. It doesn't explain why pushing a button and saying, register and has responded, impairs the independence, because after all, among other things, the SEC also says, and oh, by the way, there weren't many errors anyway, and there were very few comments, because in order to comment, a registrant has to comply with the proxy registration rules, which is not a small matter, and SEC belittles those and says, oh, there were only 50 of those in some prior year. So, how can 50 out of thousands, hundreds of thousands, of shareholder proposals make the risk of independence suddenly overwhelming? Well, obviously, the function of this rule is to make it easier for registrants to file responses, whether they're to errors or not, and then that imposes a burden on PVABs to then disseminate those publicly filed views to their clients, and the commission, I would emphasize, I really think the commission specifically identified the concerns that it was considering in 2022, and it was merely, it was picking up the same concerns that it recognized in 2020. So, on timeliness, in discussing the concerns about timeliness, the first and primary thing it mentioned was the concern that the additional burdens from both the notice and awareness commissions could disrupt the preparation and delivery of proxy voting advice, specifically because of all the amount of work that has, and the amount of recommendations they make during proxy season. Well, I mean, if it disrupts it by saying, we're going to get the age of the director candidate correct, we're not going to misrepresent the company's proposal about such and such, we're not going to misstate the annual revenues, I mean, that was the whole purpose, you know, that's, it's, is that what it is? No, the... Well, what is, just what is the problem with timeliness? The problem with timeliness is the concern that the commission mentioned both in 2020 and 2022. Yeah, but if you're reversing, they just said, commenters complained about timeliness, but we think we've addressed that by saying at or before, which, and not even dictating how they transmit the information to the registrant, so they've gone from a pre, preview situation where they have to show the registrant in advance to at or before, so I don't understand how at or before impacts timeliness. Again, in, in the 2020 release, in discussing the notice condition in particular, not the notice, not the full burdens of the rule as a whole, it said that the notice condition had addressed the particular timeliness concerns raised by the advance notice, the advance review process of the proposal, but then later in discussing the actual notice and awareness conditions as a whole, all the commission said was that this rule, because of the changes it had made overall, would result in fewer disruptions than, and it didn't go into detail about the magnitude, make any findings about the magnitude of that concern, because it didn't have the information or data to do so. It could only weigh that mitigated risk against the equally unquantifiable and uncertain potential benefits, informational benefits of the rule, and make a policy judgment that one outweighed the other, and in 2022, the commission reconsidered those same uncertain and unquantifiable risks, also without any data to figure out what the magnitude of those risks are, just having to make a policy call that lots of people disagree on. Factually speaking, if risk to timeliness, once the rule has gone into effect, is that the PVABs would have already been complying with the rule, and indeed, what I'm saying is this is sort of irrational and arbitrary, because the 2022 explanation also says that, well, the PVABs are doing a bunch of this voluntarily, which means, as 2020 emphasized, that the costs are very not large, timeliness questions should not be serious, and then they're also diminishing the idea that there is even a problem to address, and if there's not much of a problem, then timeliness and independence can't be much of a problem either. I guess a few things. If PVABs were already complying, then the commission's point was that they and their clients clearly thought that these compliance burdens posed risks. By rescinding the provisions, you address those concerns, you take away those costs and those risks, you don't require, PVABs are no longer required to meet them. If they weren't already meeting the conditions, then you save them from the costs and the risks of meeting them, and on the idea that we know that these were minimal risks or anything, that's not what the commission didn't make any finding as to the magnitude or existence of the risks, and if I could just talk about the PRA burden that the plaintiffs now point to in their reply brief, the PRA analysis is not a useful metric for a few reasons. The PRA is a measure of the paperwork burden, which only captures a subset of the costs and the risks of the rule. The commission specifically emphasizes at the beginning of the PRA analysis in both 2020 and 2022 that the PRA is not a comprehensive analysis encompassing all the costs and risks. So in 2022, for example, it says, a discussion of the expected economic effects of the conditions can be found in the separate economic analysis section, which is where the commission addressed the risks to timeliness and independence that it had mitigated but not eliminated, and those are the risks that the commission specifically picks up, both by citing in particular the commenter that raised that same risk on timeliness and on independence, specifically explaining that the burdens imposed by the notice and awareness conditions may cause PVABs to err on the side of caution in complex or contentious matters, which could impair the independence of their advice and erode the confidence, the investor's confidence in the integrity of that advice, and the commission... Let me try an analogy, and tell me what you think of this analogy. A court traditionally requires paper copies of briefs, but obviously acknowledging that we now have e-mail, the court adds a new requirement. You have to also e-mail the court. Is that... What are the problems with the burdens of that on parties? Does that... The burdens of having to... Yeah, when you file your brief, you also have to e-mail it to us. Does that impose a substantial cost to the parties? When you file a fax alone, that may not be a significant burden. Again, we don't know exactly what... Why is your case different? Because we don't know exactly what PVABs will have to do to comply with these rules. The commission said it would be a facts and circumstances test. But all you've really done is replace send an e-mail to the court with send an e-mail to the registrant. Well, again, they have to have systems in place, and they have to monitor... Lawyers have to have systems in place to e-mail the court. They have to monitor every... For every recommendation they make, they have to monitor... That would be true of every brief you file or every motion or reply. And they're saying... And given the significant time constraints that they are already under, having to have those systems in place, having to monitor... And again, we don't... There was... The commission didn't make any findings in 2020 about what PVABs would have to do to comply. The concern is that when you add those compliance risks to the already... The burdens they are and time constraints they already face, and when you make them do it, when you add those burdens, precisely when their advice provokes a company's response, it's reasonable to think that there's a risk that they might tailor their advice to avoid those burdens, which is precisely what the commission said in 2022. Again, we don't know exactly the extent of those risks, the magnitude, but we also... We didn't in 2020, and we didn't know the magnitude of the potential informational benefits, which in 2022 the commission reasonably explained, and the plaintiffs in this case don't challenge the commission's determination that on the other side, those benefits on the other side of the balance were not... But the commission... I mean, didn't this whole process take place over more than 10 years during two different administrations? This whole process of trying to put more democracy and transparency into PVAB advice? So, there certainly were... All that... There certainly were 10 years of discussion and debate leading up to this rulemaking, but it's really important to emphasize that those years of discussion and debate did not result in consensus. Well, they resulted in, initially, the 2019 rule, which was quite onerous on PVABs, and that was let out for comment, and then it was significantly watered down. I mean, I don't mean to be judgmental about it. Factually, it was watered down because no longer did the PVAB have to preview its advice to the company so the company could immediately respond. So, what I'm saying is, again, a single thread out of a very complex rulemaking deal, the point of which was to level the playing field between PVAB advice on the one hand, which may be for goals and purposes that are inimical to shareholder value maximization, and the company's ability to know what that advice is in order to counter it. And you're saying, oh, my, oh, I clutched my pearls. They may have to pay... You know, they may have to expend a little more time to monitor responses to our PVAB advice, and therefore, the whole idea of punching these buttons and giving this notice, the whole idea of So, I see my time is up. Well, I'm sorry. I'm sorry I couldn't explain it more succinctly, and I regret that. If I may respond with a couple points. I mean, the commission changed the 2019 proposal because it listened to the concerns of investors and PVAB clients that timeliness and independence were extremely important interests that shouldn't be impaired, and the commission listened to those same entities when they came back and said, we know you tried to mitigate these. You thought you had mitigated them enough to balance the uncertain benefits, but we don't think you've done that. And the commission could reasonably listen to them and say, look at the same benefits and risks and say we come out a different way. That policy call was contested, and reasonable people disagree. And the other point I could make, if I could, is that we're not talking about leaving PVABs unregulated. All of the concerns you talk about about PVABs, PVABs are not being unregulated. The commission emphasized that they are subject still to potential liability for material misstatements and omissions. A fact in their advice that they have to disclose conflicts of interest. This is really just about looking at one particular regulatory intervention and whether the costs, the uncertain costs. I mean, you know, it just struck me that you have 200 pages versus 20 pages. You have 10 years of discussion versus one year at most. And then you let the notice out right over the holidays. How many other rules changes has the SEC made in the last couple of years with 30 days notice over the holiday season? There are a bunch of rules, a number of rules around this rule that were issued with 30 to 60 day time frames. 30 days, I'm saying 30 days. Yeah, I think a couple of them may have been 30 days or close to 30 days. Over the holiday season. Again, the- In fact, in the middle of the proxy season, when all this concern about PVABs and companies being at the end of their fiscal year and shareholder meetings, annual shareholder meetings and so on, SEC did it at the end of the, at that critical time as well as right around the holiday season. I don't think so, Your Honor. The proxy season is in the spring, so this wasn't in the middle of proxy season. And I would just say that the same length comment period was used for the targeted policy changes affirmed by this court in clean water action by the D.C. Circuit and the National Association of Homebuilders cases. You can cite that to us. Pardon? Is that in your- Clean water action is in the brief. Both of those cases are in the brief. And if you look at the targeted rule changes that were made in those cases, they were done with 30 days with- This isn't targeted. This is basically undoing the 2020 rule. Well, the 2020 rule contained other provisions as well. And the commission- I understand that. And all you maintained was conflict of interest.  And we all know there's substantial question about how effective guidances are. There was also the codification of the commission's interpretation of solicitation, which has real consequences. And those were contested provisions that generated a lot of comment that are the subject of ongoing litigation. And so the commission looked at the 2020 rules and chose a particular subset to target and used the same comment period that agencies have used before in the cases that I mentioned. But you're telling, just once more, you have not identified a single SEC rule change that change, modification of preexisting approved policy that had 30 days notice over a holiday season at the end of the financial period for most registrants. I mean, so courts, both this court and the D.C. Circuit, have said that 30 days is generally sufficient. I understand that. And the overlap with- Do any of those cases involve end of the year or season? I am not sure. But no court has said that overlapping with holidays- Was there a particular reason why you couldn't wait until the end of January? It had to be end of December? The commission explained that it was because the 30 days was appropriate because of the targeted nature of the rule. The commission explained that it chose that comment period because of the targeted nature of the rulemaking. And all of the evidence suggests that the comment period did, in fact, elicit meaningful comment. Plaintiffs are unable-the commission received dozens of comments raising all of the issues here. It received 10 percent of the comments it had received before. Be that as it may, what was the status of the litigation to say that non-enforcement of the rule was illegal? At what point, Your Honor? At the point that SEC suddenly pulls out of a hat the new rule. At that point, both of the proposal and adoption, that was not yet decided. But that litigation was underway, wasn't it? That litigation was underway, but plaintiffs don't make the argument that the court can or should look beyond the rationale offered by the commission. I understand that, but we're in a very-we're in a markedly unusual time in the administrative state where various administrations seem to have a policy of pulling in new rulemakings every time they get challenged in court. And this is not something that courts have had to deal with, so I'm just trying to get the facts out. I guess I would say that rule changes following changes of administration occur frequently. They happened in the last administration, and FOX and Clean Water Action, Your Opinion, Your Honor, make clear that agencies are permitted to do that as long as they go through notice and comment and they provide a reasoned explanation. And here the commission offered a number of good reasons for weighing, balancing the interests differently. And even if you're not sure about the adequacy of the notice and comment period, plaintiffs have barely even tried to meet their burden to show that they were harmed in any way by this comment period. They received notice of the rule at least 39 days before the end of the comment period. The comment that they offered, they asked for more time to supply data, and they were refused. Well, no party, amici or plaintiffs or anybody, has come forward with any or pointed to any evidence that would have- So you mean, yeah, well, that's one of those catch-22 situations, though, isn't it, where they say, nope, you can't introduce any data, and then when you get into court review, you say, well, they didn't introduce any data. Why aren't they doing it now? So you have to-you're making them expend time to litigate something that may or may not be allowed by the court or even the agency. I mean, these- That's just the cold, hard world, isn't it? I don't think so, Your Honor. I mean, this was not the first time that these issues were ventilated. We had a whole rulemaking in 2020, and there was no data remotely- Let me give you an analogy. If you have a court that routinely grants 30-day extensions on briefs, which I'm sure would be a fair way of describing our court, but all of a sudden, a particular case, for whatever reason, the court is all of a sudden very grudging and refuses to- Isn't it natural for parties to wonder why is the court suddenly so incurious? Do I understand correctly, 60 days has been the norm in this particular rule in particular? No, 60 days was used- So why all of a sudden switch? 60 days is fine, 60 days is fine, 60 days is fine. Now, all of a sudden, it's got to be 30, it's got to be 30, even though it's the holiday season, and there's no particular stated cause for urgency. I mean, agencies do sometimes or frequently use common periods that are more than the APA requires. The question is whether 30 days- The question is why the sudden change, unless you're telling me that I'm misunderstanding the record. Well, you say a sudden change- It just seems suddenly incurious. For a different and broader rulemaking in 2020, the commission chose to use 60 days. It chose to use 30 days for this narrower rulemaking, and that 30 days is the length of common period that has been used, as in the cases that I cited, for other more- When you say narrower, I certainly get the idea if something is, you know, there's less at stake, then you don't maybe need as much time, but isn't this the rescission of the earlier rule? It would take 60 to enact, but 30 to repeal. So the earlier rulemaking- 60 to one party, but 30 to the other side, right? Again, the commission here in 2022 was just revisiting the balance of interests with respect to one part of the rules. It didn't have to develop an entire factual record other than the new comments from investors and PVABs and the like. It was using the- it was essentially using the same factual record that had been built up before, and it turns out- They've already done the work, is what you're saying. A lot of the work has already been done, and the commission is just rebalancing, reconsidering, and explaining why. It takes a different view. It takes a different policy judgment, and I- They could have just filed the same comments they've filed before. That's sort of the- Well, they could have- they had time to file new comments, and they did. They filed comments explaining why they didn't think the conditions should be rescinded. Others filed comments arguing why they should be rescinded, and the commission looked at them. There isn't any basis to believe that plaintiffs don't identify any specific commenters, let alone hundreds that wanted to comment but couldn't. The commission has an established practice of considering late comments, which would at least suggest if there were a bunch, a lot of late comments, that there was pent-up demand. But there was a trickle of a few, which doesn't- which is not consistent with the idea that lots and lots of people were prevented. And if that was the case, you would expect plaintiffs to be able to point to it. And they certainly haven't pointed to, again, how they were harmed. They fully engaged in the rulemaking process. They submitted extensive comments, met with the commission, the chair and commission staff, twice. The commission, they don't identify any arguments or evidence, other than speculating about unspecified evidence that someone else might have come up with if someone else had more time. I mean, the whole point of administrative agencies is that they are supposed to be disinterested and experts. And the trend in today's administrative world, and we are now in the third administration of this idea, is that you have one change in the balance on the commission and suddenly the experts have a different view and the formerly disinterested advice is now today's disinterested advice. So we're in a Kafkaesque world. I think what you're describing is what has happened many times over the years. Well, it depends. I mean, I've been sitting on the court for many years now, and I'm just describing what the experience has been over the past three administrations, and I hasten to add three. I understand, but I think... Well, it all undercuts the whole idea about the administrative state. I think what FOX, decisions like FOX and this court's decision in clean water action and Judge Garland's opinion in the National Association of Home Builders, is that agencies can change their minds on difficult, controversial questions after a change in administration. There's nothing nefarious or terribly surprising about that. Does any of this, don't some of these comments talk about how, for 2022, about how it's important that the PVABs be able to give disinterested of their advice on ESG concerns? Sorry, which comments? Are ESG concerns mentioned in the comments to the 2022 rule? I am not sure, and certainly the plaintiff's only argument on the substantive... Well, I know there's an amicus here called the ESG something or other. Just a couple points. I don't think plaintiffs have put forward that argument in their summary judgment motion. Their argument is that the commission inappropriately considered a few risks. That's the extent of their argument, and I would just go... Well, I'm just wondering what the legal basis is for incorporating any consideration of ESG into policies of the Securities and Exchange Commission. Do you know? I mean, I don't think this case raises that issue, and so I'm not going to opine for the commission on that. I would just say that PVABs remain, after this rule, remain regulated. They have to, they're subject to liability for material... PVABs are, those are, you know, private companies. The SEC is a public entity, and I'm just wondering what the legal basis is for incorporating ESG into regulations of the Securities and Exchange Commission. I mean, I guess just because that issue was not briefed here and raised here, and I know you understand that, I don't want to opine for the... You're an expert. I would prefer not to opine for the commission on those issues, obviously. They're relevant in plenty of contexts, but I don't think they are determinative here. And I guess if I could just make one more point about this idea that there is a factual, as opposed to a difference in policy judgment. Plaintiff's fundamental argument is essentially that the commission made a definitive finding that a regulation did not pose certain risks at all without considering all of the relevant burdens, just one of the conditions, without citing any actual record evidence, and without having the benefit of the views of the regulated parties and their clients on the requirements that were adopted. The commission didn't need to do that to justify the 2020 rules, and it didn't do that. As I said, if you look at pages 55139 and 55137 of the release, of the 2020 release, it specifically acknowledged that there were distinct risks to timeliness and independence that are the same ones that it ended up citing in 2022 as the risks that it was weighing in the policy balance. And it made a policy judgment that the similarly unquantifiable and uncertain informational benefits justified those mitigated risks. And the commission in 2022 revisited that judgment and gave a whole bunch of reasons why it came out differently than it did in 2022. In either case, was there evidence or data allowing the commission to determine the magnitude of those risks? And I know over time I'm happy to answer any further questions or address any other issues or to just ask that you affirm the judgment of the district court. Thank you very much. Mr. Reed, do you need additional time? Whatever the court is willing to offer, but I'll try to be brief, Your Honor. Thank you. Just to start with a factual question to Judge Jones's point about the timing of the publication, the initial litigation, Your Honor, we had filed that initial litigation about the unlawful suspension shortly after that suspension occurred in June. The case, the summary judgment proceedings were fully briefed, I believe, by mid-November. I don't have the precise date with me, but if I recall correctly, we had respectfully asked the district court, if possible, to resolve that case by the end of December 2021 or early January 2022 so it could be in place for the proxy season. Now, the district court was not able to do that. The district court didn't decide the case until the following September, but we had briefed that case expeditiously in order to allow that to be teed up for resolution. So at the time this came forward, I believe the briefing at that point was complete, and then it is notable that when the 2022 rescission rule issued, there's a footnote, I believe it was footnote 18, but there's a footnote in that rescission that specifically contemplated that the rescission mooted our ongoing litigation. Now, the district court rejected the SEC's argument on that score and found that there was no mooting of our case and then proceeded to find the SEC's action unlawful, but I certainly think there probably was some interrelationship that the court was suggesting. We think this rule, though, needs to be vacated for, again, the three principal reasons that I described earlier. The first, I think, is the place to start. It's the most simplistic. It's the Texas v. Biden and Fox issue, and that is the APA is designed to have a stabilizing effect on agencies. A change in a vote on the commission or a presidential election certainly can change policy prerogatives or agenda, but what it can't change is factual findings that the agency previously made unless the agency goes through a reasoned and rational process to explain to the regulated public why it's making that change. And here, I don't think there's any way to reasonably look at the rule that was written in 2020 other than to say that looking at the rule that the SEC was putting in place in 2020, it said there will be no significant risks to timeliness or independence. Just one passage, which frankly might be the best passage for the SEC, appears at 2033 to 2034 of the record. I'm reading, quote, The final amendments will substantially address, if not eliminate altogether, the concerns raised by commenters related to objectivity and timing pressures associated with the proposed engagement process. So it says will substantially address, if not eliminate altogether. The upshot of that and other statements that are even more unqualified is that any risk that remains is not a significant one. But in 2022, the SEC says those same risk factors are, in fact, significant and so significant that the rule should be rescinded in the whole. That is the exact kind of factual, predictive judgment that was at issue in Texas v. Biden. It goes unaddressed and unexplained, and on that basis alone, we think the court should say APA has a stabilizing effect. Agencies have to be cognizant of what they've done before. They have to explain why prior factual determinations were mistaken, misguided, or the like. They've not done that here. That alone is a basis to set this aside. But turning from Texas v. Biden to just the underlying what I call substantive, arbitrary, and capriciousness, I think as the Court has well articulated, we don't see any rational connection between the 2020 rule and concerns about timeliness or independence because in 2020, the SEC was pretty careful in explaining how it modified the 2019 proposal to address concerns about timeliness or independence. It went through thorough explanation as to why there was no timeliness or independence concerns, and quite frankly, we don't think there's a rational discussion, a reason as to why any of those risks remain. We know the SEC kind of waves their hand around and says, well, there's cost, there's burden, there's timeliness, there's independence issues, but what there's not is a rational articulation of why those are correct. We thoroughly explain in the briefs why there is no actual basis to think that the 2020 rule poses any of those risks to the extent that they try to picket footnotes or parentheticals. Again, we show in the briefs that either those issues were not addressed by the 2020 rescission or they're just not rational on the face of it. And if arbitrary and capricious review has any teeth, it must be in a situation like this where the most the agency can do in a very thinly reasoned rescission rule is just kind of wave their hands at a risk without giving any substantive explication as to why the issue, the risk that they're suggesting, is even remotely related to the policy that's being rescinded. SCC argues that you abandoned arguing whether PVAB voluntary practices have an impact on the 2020 or 2020 rule. Is that correct? Your Honor, I think it's true on appeal. We narrowed our arguments because we thought that this was unlawful for so many reasons. We didn't have to burden the court with every one of them. But I think our point below, which I certainly don't walk away from, is that to the extent that the 2022 rule rests on proposed continuing voluntary behavior of the proxy firms, that that's a pretty irrational basis for them to rely upon. Now, to the extent that they have any suggestion that the voluntariness is relevant, again, we think that's irrational. But, again, I— Wave issues, not arguments. Is that normally— That's right, Your Honor. And we've certainly— And moving on, they say that you do not challenge their finding of fact that there is little or no compelling evidence of errors in proxy advice. Well, we certainly challenge that, Your Honor. I thought so. We've described throughout our briefs all of the robust evidence, the National Association of Manufacturers we talk about in our brief. And in your reply brief, you talk a lot about post hoc justifications. What are the most obvious post hoc justifications that you see? Well, the bulk of, I think, the government's argument with respect to timeliness and independence, I think, are efforts at post hoc justification. For example, one of the most obvious ones is they suggest in their brief that there could be litigation over the adequacy of the mechanism. Well, there's nothing remotely suggesting a risk to litigation over the adequacy of the mechanism to notify proxy firm customers of statements by registrants. That's a completely fabricated argument by counsel that appears nowhere in the 2022 rescission rule. And there are others along that line that we point out in the reply brief, but I think that's a very clear example. So, again, second reason, we just don't think this can possibly pass muster under substantive arbitrary and capricious test. Third and finally, if the court were to affirm this process, this 30-day process, I don't see how the court respectfully could affirm without saying there's a blanket 30-day rule that if you give 30 days, no matter the circumstances, that that is essentially a safe harbor. I don't think that is or should become the law. I don't think they've pointed to cases where this issue was not fully litigated that just generally, remotely say 30 days could be enough. We're not asking the court to adopt a per se rule that 30 days is never enough. Rather, you have to look to the circumstances. And if there's ever a circumstance to say 30 days was not reasonable in the broader context, I think it has to be this case. Again, they point out that— What do you make of their theory, as I heard it, which is this wasn't 30 days to come up with completely new intel and information. It's essentially a rehearing proceeding, right? You've already briefed these issues. Just brief it again. Well, they, in the 2022 rescission, criticized the comments that were received as not giving enough quantitative data. And the U.S. Chamber explained that it needed more time to be able to provide the quantitative data that they had been requesting. So this notion that it's just sort of a do-over I don't think really carries a lot of weight. But additionally, the holiday season I don't think can be overlooked. I mean, I know my clients were reviewing and working on their edits to their comment letter on Christmas Day. It is true that they filed a comment letter, but I think there's a reason why there was only 10 percent response of the prior time, because this was done at such an inopportune time that was both at the end of the year fiscal season as well as coinciding with the holiday season. And we're in the context of a rule that had been chopped down from 60 days to 30 days. Again, I think there's no reasoned explanation as to why 60 days was appropriate to adopt the rule when in half the time to just categorically rescind that same rule. Again, though, that's against the context of the highly unusual timing around the holidays and folks asking for more time in the SEC. We need to adopt a bah humbug doctrine. Well, again, I think all of the factors here point to that if it's ever not a meaningful opportunity, I think this would be a poster child for a case of one that is. And again, the inverse of that is if this is procedurally valid, it's hard to see any circumstance in which a very shortly truncated comment period would not be. And the argument about harmless error, they make the point that five comments were submitted late and they considered them. I think that's just a suggestion that the SEC accepts folks who break the rules and I think a suggestion that the rules somehow don't matter. But I think the rules do matter, and the reason a lot of folks didn't submit comments this time around is because people aren't going to put the work into submitting comments into an administrative proceeding if they know they're not going to be able to timely file them. So the notion that the SEC might still consider the views of people who broke the rules is not a justification for why the process that was used was a correct one. Further, in terms of considering the harmlessness, this Court's case on both U.S. Steele and United States v. Johnson is quite instructive. United States v. Johnson, the Court explains, when you have a complex and nuanced rule that addresses certain policymaking issues, that is the precise circumstance in which you would think that a harmless error finding would be, as the Court put it, rare. That's certainly the case because it is essentially impossible to predict the counterfactual of what additional material would have been available if a proper, legally appropriate comment process had been adhered to. The government wants to basically create an impossible burden where a party challenging an unlawful process has to essentially prove what the precise effects of the procedural violation with the injury immediately, concretely, would have caused. No court has accepted that as a harmless error analysis because it would essentially insulate agencies whenever they use these sorts of unlawful procedures because, again, as the Court pointed out, it creates a scenario where either you produce the material, then the agency says we've considered it, so there's no harm, or they say you haven't identified what the alternative material would be, so there's no harm. In that scenario, there would be no judicial review, essentially, over unlawful agency procedures. That certainly is not and should not be the law. Am I mischaracterizing the business about timeliness of notice versus adequacy when I say it amounted to pressing buttons on a computer? Not at all, Your Honor. I think, if anything, the Safe Harbor and the 2020 rule makes clear that all they have to do is provide same notice, either via an email or even a posting on their website, press that button, and all they have to do is provide a link to the Edgar filing, so a public company files a supplemental proxy statement. They just have to give the link, the link to where it is on the SEC's web page, to their clients. And that can all be done immediately, almost without human intervention, right? Yes, Your Honor. The proxy firms themselves said that that would take up to 30 minutes. I don't really see how they get to 30 minutes, but we're not talking anything remotely significant. So how they suggest that this has any effect on the timeliness of the advice that's already been provided or on the independence of the advice, it just doesn't make any sense. There's no rational connection. They just can't wave their hands and say burden and independence and kind of suggest that that's enough. There has to be some why there. There has to be a connection. That's completely lacking and we think is a basis to hold that this rulemaking was unlawful and should be vacant in its entirety. Thank you, counsel. Thank you. Thank you.